IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Harrisonburg Division

| | |
|---|---|
| MARKITA D. NELSON, )<br>    Plaintiff, )<br>)<br>v. )<br>)<br>NANCY A. BERRYHILL, )<br>Acting Commissioner, )<br>Social Security Administration, )<br>    Defendant. ) | Civil Action No. 5:15-cv-00085<br><br>MEMORANDUM OPINION<br><br>By:    Joel C. Hoppe<br>United States Magistrate Judge |

Plaintiff Markita D. Nelson ("Nelson") asks this Court to review the Commissioner of Social Security's ("Commissioner") final decision denying her applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act (the "Act"), 42 U.S.C. §§ 401–434, 1381–1383f. The case is before me by the parties' consent under 28 U.S.C. § 636(c)(1). Having considered the administrative record, the parties' briefs and oral arguments, and the applicable law, I find that the Commissioner's decision is supported by substantial evidence.

I. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final decision that a person is not entitled to disability benefits. *See* 42 U.S.C. § 405(g); *Hines v. Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is limited—it may not "reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment" for that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012). Instead, the Court asks only whether the Administrative Law Judge ("ALJ") applied the correct legal standards and whether substantial evidence supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011).

1

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review takes into account the entire record, and not just the evidence cited by the ALJ. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984). Ultimately, this Court must affirm the ALJ's factual findings if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam) (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" if he or she is unable to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); 20 C.F.R. §§ 404.1505(a), 416.905(a). Social Security ALJs follow a five-step process to determine whether an applicant is disabled. The ALJ asks, in sequence, whether the applicant: (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals an impairment listed in the Act's regulations; (4) can return to his or her past relevant work based on his or her residual functional capacity; and, if not (5) whether he or she can perform other work. *See Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983); 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The applicant bears the

burden of proof at steps one through four. *Hancock*, 667 F.3d at 472. At step five, the burden shifts to the agency to prove that the applicant is not disabled. *See id.*

## II. Procedural History

Nelson filed for DIB and SSI on March 19, 2012, alleging disability caused by depression, blood clots in her left leg, attention deficit hyperactive disorder, Human Immunodeficiency Virus ("HIV"), and bipolar disorder. Administrative Record ("R.") 368–69, 376–83, 409, 413, ECF No. 9. She alleged an onset date of October 17, 2010, at which time she was twenty-seven years old. R. 368, 376, 409. Disability Determination Services ("DDS"), the state agency, denied her claims at the initial, R. 124–34, 135–45, and reconsideration stages, R. 155–68, 169–82.

On June 10, 2014, Nelson appeared with counsel at an administrative hearing before ALJ Brian B. Rippel. R. 83–119. Nelson testified that she worked fifteen to thirty-five hours per week as a sandwich maker at Burger King from September 2012 to August 2013. R. 90–91, 99. This job required her to stand for four to five hours a day, which caused swelling in her legs and pain. R. 99. She left that job and began working full-time as a certified nursing assistant ("CNA") because she thought it would be easier on her legs than working at Burger King. *Id.* Nelson had one patient, who she assisted in showering, getting up and down, walking to the bathroom, cooking, and cleaning. R. 101. In November 2013, Dr. Gray "put [her] off of work" because Nelson felt that she might drop a patient when her arms or hands went weak or her legs gave out or hurt. R. 89–90. She did not seek other work because of her physical problems, including weakness in her arms and legs and pain in her back and neck. R. 92–93. She also experienced numbness in her hands. R. 94. Thurner-May syndrome caused her legs to swell, and a stent placed in her left leg in 2012 made the swelling worse. R. 93. Her legs swelled even when she

3

was sitting, and she could not walk with a cane because she would drop it. R. 97. Nelson also had trouble holding plates, cups, and her laptop computer, all of which she had dropped. R. 97–98. She could no longer engage in everyday activities with her children, do housework, or cook. R. 93, 96. Nelson took Gabapentin for nerve pain, but it caused her vision to become blurry and her arms and hands to go numb. R. 94, 116. She took Dilaudid, Oxycodone, and morphine, but they just made her tired and dizzy and did not help her pain. R. 94. Although she did not take them the day of the hearing, Nelson had been prescribed Amitryptyline and Tramadol. R. 95. Those medications "knocked [her] out" or put her to sleep. R. 95. Side effects from her pain medications prevented her from being able to cook for her children, and it took her hours to clean a single room in her house because she had to take breaks to rest. R. 95–96. She could stand for five minutes before needing to sit. R. 100. After taking pain medications, Nelson could not stand at all because she would fall. *Id.* She had experienced leg pain for years, but it was getting worse. R. 99. After Nelson testified, a vocational expert also testified regarding the nature of her past work and her ability to perform other jobs in the national and local economies. *See* R. 102–16.

ALJ Rippel denied Nelson's claim in a written decision issued on July 24, 2014. R. 71–82. He found that Nelson had severe impairments of HIV seroconversion, history of leukopenia and thrombocytopenia, venous system disorder status post left iliac stenting, mild L5-S1 arthropathy, and history of May-Thurner Syndrome. R. 73. Although Nelson had been diagnosed with bipolar disorder, attention deficit hyperactivity disorder, and post-traumatic stress disorder, the ALJ deemed them non-severe. R. 74. The ALJ then determined that none of Nelson's impairments, alone or in combination, met or medically equaled the severity of a listed impairment. R. 74-77. As to Nelson's residual functional capacity ("RFC"),[1] she could perform

---

[1] A claimant's RFC is the most she can do on a regular and continuing basis despite her impairments. 20 C.F.R. §§ 404.1545(a), 416.945(a); SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996).

medium work[2] with the additional limitations that she could occasionally push/pull and perform foot controls with her left lower extremity and frequently stoop and crouch. R. 77. Given this RFC, Nelson could not return to her past relevant work, but she could perform other jobs in the national and local economies as identified by the vocational expert. R. 81–82. Therefore, the ALJ determined that Nelson was not disabled. R. 82. The Appeals Council denied Nelson's request for review, R. 1–4, and this appeal followed.

III. Discussion

Nelson challenges the ALJ's credibility assessment Pl. Br. 5–11, ECF No. 14. Nelson argues that pain in her left lower extremity prevents her from performing the physical demands of medium work, interferes with her ability to concentrate, and would affect her work attendance.

The regulations set out a two-step process for evaluating a claimant's allegation that she is disabled by symptoms, such as pain, caused by a medically determinable impairment. *Fisher v. Barnhart,* 181 F. App'x 359, 363 (4th Cir. 2006) (citing 20 C.F.R. § 404.1529). The ALJ must first determine whether objective medical evidence[3] shows that the claimant has a medically determinable impairment that could reasonably be expected to cause the kind and degree of pain alleged. 20 C.F.R. § 404.1529(a)–(b); *see also Craig*, 76 F.3d at 594. If the claimant clears this threshold, then the ALJ must evaluate the intensity and persistence of the claimant's pain to

---

[2] "Medium" work involves lifting no more than fifty pounds at a time, but frequently lifting or carrying objects weighing twenty-five pounds. 20 C.F.R. §§ 404.1567(b), 416.967(b).

[3] Objective medical evidence is any "anatomical, physiological, or psychological abnormalities" that can be observed and medically evaluated apart from the claimant's statements and "anatomical, physiological, or psychological phenomena [that] can be shown by the use of medically acceptable diagnostic techniques." 20 C.F.R. §§ 404.1528(b)–(c), 416.928(b)–(c). "Symptoms" are the claimant's description of his or her impairment. *Id.* §§ 404.1528(a), 416.928(a).

5

determine the extent to which it affects her physical or mental ability to work. SSR 16-3p, 2016 WL 1119029, at *4 (Mar. 16, 2016); *see also Craig,* 76 F.3d at 595.

The ALJ cannot reject the claimant's subjective description of her pain "solely because the available objective medical evidence does not substantiate" that description. 20 C.F.R. §§ 404.1529(c)(2), 416.929(c)(2). Nonetheless, a claimant's allegations of pain "need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges she suffers." *Craig*, 76 F.3d at 595.[4] The ALJ must consider all the evidence in the record, including the claimant's other statements, her daily activities, her treatment history, any medical-source statements, and the objective medical evidence, *id.* (citing 20 C.F.R. § 404.1529(c), and must give specific reasons, supported by relevant evidence in the record, for the weight assigned to the claimant's statements, *Eggleston v. Colvin,* No. 4:12cv43, 2013 WL 5348274, at *4 (W.D. Va. Sept. 23, 2013).

In his written opinion, the ALJ discussed Nelson's testimony about her symptoms and limitations, and he found that although her "impairments could reasonably be expected to cause the alleged symptoms," her statements about the severity of those symptoms and their effects was not credible. R. 78. The ALJ determined that the medical evidence, including diagnostic and clinical findings, and nature of the treatment Nelson received for her severe impairments

---

[4] The Social Security Administration now cautions that the subjective prong of this analysis should not be approached with an undue focus on the claimant's "credibility." *See* SSR 16-3p, 2016 WL 1119029, at *1. The scope of this inquiry should be limited to those matters concerning the claimant's symptoms, rather than other factors that might otherwise be probative of the claimant's overall honesty. *Id.* at *10. "In evaluating an individual's symptoms, [ALJs] will not assess an individual's overall character or truthfulness in the manner typically used during an adversarial court litigation. The focus of the evaluation of an individual's symptoms should not be to determine whether he or she is a truthful person." *Id.* Statements that are internally inconsistent or that are inconsistent with the other evidence of record, however, may lead the ALJ to "determine that the individual's symptoms are less likely to reduce his or her capacities to perform work-related activities." *Id.* at *7.

undermined her claims of severe limitations and showed that she could perform medium work. R. 78–79. Nelson's treating physicians could not identify an etiology for her symptoms. R. 79. Additionally, Nelson did not give her best effort during a consultative examination, thereby diminishing her credibility. *Id.* Nelson's activities of daily living, including her work activities after the alleged onset date, showed a greater functional capacity than she claimed. R. 79–80. Finally, notwithstanding the medication information submitted by Nelson's counsel, no treatment records identified any medication side effects. R. 80. For the reasons discussed below, I find that the ALJ's credibility determination finds ample supported in the record.

A review of the record shows the following relevant medical evidence. On October 8, 2010, Nelson was admitted to the hospital after losing consciousness at work. R. 534–36. She remained at the hospital for nine days. Nelson complained of left leg pain of a sudden onset. In 2008, Nelson had been treated for left leg deep vein thrombosis ("DVT"), which was cleared. R. 627. DVT was ruled out after an ultrasound of her lower extremity showed no blood clot. R. 525, 535. She was assessed with leukopenia, and her HIV viral load testing was high. Magnetic Resonance Imaging ("MRI") of her lumbar spine showed mild focal arthropathy at L5-S1, but was otherwise normal. R. 535, 590. Nelson was prescribed oxycodone for pain and discharged in stable condition.

In June, August, and October 2011, Nelson went to the Emergency Department at Augusta Health with complaints of lower left leg pain. R. 658–63. Physical examinations were normal. She had no lower extremity swelling, walked normally, and had full strength. Ultrasound for DVT was negative. R. 666. Nelson reported that she stood a lot at her job. Treating physicians were unable to identify the cause of her pain, provided pain medications, and discharged her in stable condition. In November, Nelson complained of left leg swelling and pain

7

for the past three years that nothing made better. R. 627. She said she could walk only ten to fifteen feet. Physical exam was normal. R. 629. Noting the "unilateral symptomology" and worsening symptoms with use of compression stockings, the treating physician's assistant suspected May-Thurner Syndrome. *Id.*

On January 3, 2012, Nelson was evaluated for complaints of left leg swelling and pain. R. 618–19. She also complained of pain in her right leg that began two weeks before. She had some left leg edema and was symptomatic for May-Thurner Syndrome. An MRI taken that day revealed compression of the left common iliac vein between the lumbar vertebral body and the right common iliac artery–findings consistent with May-Thurner Syndrome. R. 638–39, 641–42. There was no evidence of DVT or venous insufficiency. On January 20, a left iliac vein stent was placed. R. 616–17. CT scan showed that the stent was in a proper position. R. 636. After the procedure, Nelson complained of significant back pain, which was effectively controlled with medications, and she was discharged. R. 615. A week later, Nelson reported that the swelling had resolved, but she complained of lower back pain that was "worse after chasing her children throughout the day." R. 613–14. The nurse practitioner questioned the relation between Nelson's complaint of back pain and her stent procedure. She recommended Nelson use anti-inflammatory medications and heat, avoid heavy lifting, and follow-up in four weeks.

In February, Nelson's left leg swelling was still present, but had improved. R. 609–10, 611–12. The stent was noted to be patent. Examination showed left leg weakness and edema. R. 612. She complained of significant back pain with left leg neuropathy. She was prescribed Naprosyn and Gabapentin, and an MRI was scheduled.

In response to Nelson's complaints of low back pain radiating into her left leg, an Electromyography ("EMG") study was conducted on April 2012. R. 604–06. The study was

8

Case 5:15-cv-00085-JCH   Document 20   Filed 03/31/17   Page 8 of 13   Pageid#: 1025

normal and showed no evidence of left lumbar radiculopathy. R. 606. A lumbar MRI taken April 30 was also normal. R. 797.

Nelson regularly visited Thomas R. Gray, M.D., with complaints of left leg pain. R. 688–98, 770–78. He prescribed pain medications for her and referred her to the pain clinic, but he consistently noted that her pain had no known etiology, R. 689, and none of her doctors had "ever been able to figure out what is going on with her leg," R. 693. Ultrasounds consistently showed no blood clots. Nelson said her pain medications, including oxycodone and Gabapentin, did not control her pain. In July 2012, Nelson reported that standing and walking made her pain worse, and she had quit working at Wendy's because she was regularly sent home for pain. R. 772. In August, Dr. Gray increased her dose of Amitriptyline. R. 770.

On January 12, 2013, Bryan Eckerle, M.D., conducted a consultative examination of Nelson. R. 832–37. He observed that Nelson had a steady, slow, antalgic gait and full muscle strength in her upper and lower extremities. Sensory and reflex examinations were normal. Her joints showed no swelling, erythema, effusion, tenderness, or deformity. Nelson could lift, carry, and handle light objects; squat and rise from that position with moderate difficulty; rise from a sitting position without assistance; get on and off the examining table without difficulty; walk on her heels and toes with ease; hop on either foot; and tandem walk. Range of motion in all areas was normal. Dr. Eckerle found Nelson cooperative and thought she gave decent, but not her best, effort, and at times her effort was poor. He opined that Nelson could sit, stand, and walk normally during an eight-hour day; lift and carry thirty pounds frequently and fifty to sixty pounds occasionally; frequently bend and stoop; occasionally crouch and squat; and frequently reach, handle, feel, grasp, and finger.

In February 2014, Dr. Gray responded to a request from Nelson's attorney. R. 854. Dr. Gray noted Nelson's complaints of severe pain and weakness, but he had not been able to identify an "organic reason for her symptoms." He had prescribed a cane at Nelson's request, but he had not observed any objective evidence of weakness. In May, Dr. Gray responded to another request and advised that he had not observed any hand limitations that would support Nelson's claim of dropping things and had prescribed a walker again only at her request. R. 864. A referral for neurological examination did not reveal any pathology that would support her claims either.

After discussing this evidence, the ALJ found that the imaging showed no significant abnormality in Nelson's lumbar spine. He also noted that the stent placed in Nelson's left iliac vein remained patent and improved the swelling caused by the May-Thurner Syndrome. Physical exams produced mostly normal findings. Although Nelson continued to complain of severe left leg and back pain, her doctors could not identify any cause of that pain. Dr. Gray reported observations that contradicted Nelson's claims of lower extremity weakness and difficulty handling objects. Additionally, Dr. Eckerle's examination showed full extremity strength, including hand grip and finger abduction. R. 835. Nelson was regularly observed to have a normal gait. The ALJ determined that the limited diagnostic and clinical findings did not corroborate Nelson's claims of severely debilitating symptoms, and he noted that her doctors could not identify a cause of her claimed symptoms. From this discussion, the ALJ could reasonably find that the lack of more significant medical findings was inconsistent with Nelson's claims of severe symptoms.

Additionally, the ALJ found that Nelson's treatment was routine and conservative. *See* 20 C.F.R. §§ 404.1529(c)(3)(iv)–(v), 416.929(c)(3)(iv)–(v); *see also Dunn v. Colvin*, 607 F. App'x 264, 275 (4th Cir. 2015) ("[I]t is well established in this circuit that the ALJ can consider the

conservative nature of a claimant's treatment in making a credibility determination . . . ."). Other than having a stent placed, Nelson's treatment consisted of taking medications for her pain. Although Nelson disagrees that use of pain medications is conservative treatment, this Court and the Fourth Circuit have found that treatment with medications may be considered conservative. *Dunn v*, 607 F. App'x at 272–75; *Gregory v. Colvin*, No. 4:15cv5, 2016 WL 3072202, at *5 (W.D. Va. May 6, 2016) ("It was reasonable for the ALJ to characterize [Plaintiff's] course of treatment, consisting of pain medication, physical therapy, and steroid injections, as 'conservative.'"), *adopted by* 2016 WL 3077935 (W.D. Va. May 31, 2016). Implicit in this finding is the reasonable notion that more serious symptoms require more aggressive treatment. *See Mickles v. Shalala*, 29 F.3d 918, 930 (4th Cir. 1994) (citing the current 20 C.F.R. § 416.929(c)(3)) (explaining that "[a]n unexplained inconsistency between the claimant's characterization . . . of [her] condition and the treatment [she] sought to alleviate that condition" can bear heavily on the claimant's credibility). Here, the ALJ could find that Nelson's reliance on pain medications raised some question about the extent of her symptoms.

Nelson also argues that she experienced side effects from her medications. She submitted literature that discussed potential side effects. R. 252–365. As the ALJ noted, however, no medical provider documented his or her observations of side effects in the treatment notes. R. 80. Only once did Nelson report that Gabapentin made her sleepy. R. 691. This single instance, when compared to the dozens of treatment notes that are silent as to side effects, offers scant support for Nelson's argument. Thus, the ALJ could reasonably determine that Nelson's uncorroborated claims of severely debilitating side effects were not credible.

Moreover, as the ALJ discussed, Nelson's claims of severe limitations attributable to her medications and physical impairments are belied by her significant activities of daily living. *See*

11

*Johnston v. Barnhart*, 434 F.3d 650, 658 (4th Cir. 2005) (per curiam). In a Function Report submitted to the state agency in September 2012, Nelson stated that she lived in an apartment with her children. R. 456. Although she was not able do as much as she once could, she took care of her children and did "everything" for them. R. 457. Each morning, she got them ready for school, put her son on the bus, and walked her daughter to school. R. 456. Her leg pain limited her to preparing simple meals and required her to take breaks when performing household chores. R. 458–59. She read a lot and watched television. R. 460. Nelson gave conflicting statements about whether she played basketball rarely or was unable to play because of leg pain. *See* R. 460. After walking for two minutes, Nelson would need to rest for fifteen minutes.

At the time Nelson reported having these limitations, however, she was working at Burger King for between fifteen and thirty-five hours a week, and she was required to be on her feet for four to five hours. After she stopped working at Burger King in August 2013, she worked as a CNA for three months. In that job she assisted a patient with his or her personal care. These activities of taking care of her children, maintaining a household, and working at Burger King and as a CNA, which she performed well after her alleged onset date of October 17, 2010, and for much of the time that she complained to her doctors of debilitating pain, are strikingly inconsistent with her claimed limitations. *See* 20 C.F.R. §§ 404.1571, 416.971 ("Even if the work you have done [after the alleged onset of disability] was not substantial gainful activity, it may show that you are able to do more work than you actually did."). Thus, the ALJ could reasonably determine that Nelson's report of symptoms was not credible and that she functioned at a higher level. Accordingly, I find that substantial evidence supports the ALJ's credibility assessment.

Nelson has not otherwise challenged the ALJ's decision. In finding that Nelson had the RFC to perform other work in the economy, the ALJ discussed Nelson's statements, the medical evidence, the opinion evidence, and the testimony of the vocational expert. Having reviewed the record, I find that the ALJ's analysis and conclusions are reasonable, and his final decision is supported by substantial evidence.

## IV. Conclusion

For the foregoing reasons, I find that substantial evidence supports the Commissioner's final decision. Accordingly, the Court will **GRANT** the Commissioner's Motion for Summary Judgment, ECF No. 15, **AFFIRM** the Commissioner's final decision, and **DISMISS** this case from the docket. A separate Order will enter.

The Clerk shall send a copy of this Memorandum Opinion to all counsel of record.

ENTER: March 31, 2017

Joel C. Hoppe
United States Magistrate Judge